UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANA LYDELL SMITH,<br><br>Petitioner,<br><br>v.<br><br>ALBERTO RAMIREZ,<br><br>Respondent. | Case No. 1:14-cv-00361-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Early in this federal habeas corpus matter, Respondent Alberto Ramirez filed a

Motion for Summary Dismissal based on statute of limitations grounds (Dkt. 16), and

Petitioner Dana Smith filed a response. (Dkt. 18.) The Court did not address the Motion

for Summary Dismissal because Petitioner had a related state court action pending that

warranted a stay. On March 21, 2016, the Court stayed this federal habeas corpus action,

pending the conclusion of Petitioner's state court matter. The Motion for Summary

Dismissal was deemed moot.

On July 29, 2016, Petitioner notified the Court that his state court action had

concluded. On February 17, 2017, the Court reopened the case and issued a notice of

intent to dismiss the case on statute of limitations grounds. (Dkt. 31.) Petitioner was

ordered to file a supplemental response no later than April 18, 2017. (*Id.*)

Seven months later, on November 7, 2017, the Court issued an Order Requiring Action after it noted that Petitioner still had not filed a supplemental response to address the statute of limitations issue. (Dkt. 37.) The new deadline for filing a response was January 9, 2018. (*Id.*)

Rather than filing a supplemental response, Petitioner filed several motions seeking additional items and appointment of counsel. Because Petitioner has already filed a response addressing the statute of limitations issue and has had adequate time and resources to file a supplement, the Court will not grant any further extensions but will address the issue on the briefing in the record. Accordingly, the Court enters the following Order.

## BACKGROUND

On October 3, 2004, Joshua Johnston, 23, met a man named Derrick at a nightclub in Salt Lake City, Utah. Derrick invited Johnston to his girlfriend's house, where Johnston met Petitioner Dana Smith, 37. Petitioner had just gotten out of jail and wanted to find a woman he knew, and so he and Johnston left the house and drove around the greater Salt Lake City area in Johnston's Mustang looking for her, without success. (State's Lodging A-5, pp. 257-59.)

The pair stopped at Johnston's parents' home. Johnston's father noted that Petitioner wore a distinctive white hat with braided trim. After a short time, the pair

drove to several more places, trying to obtain some marijuana. They ended up in Burley,

Idaho, on October 4, 2004, the date of the crimes at issue. (Id., pp.258-61, 351-54.)

During their journey, Johnston testified that Petitioner told him that Johnston's dad

possibly was a secret government agent, and there was a group of three cars that were

involved in a drug-running scheme, or something of that nature. (*Id*., p. 263.) Petitioner

also told Johnston that he might know Johnston's ex-girlfriend and her mother, and that

they might be involved in a witness protection program. (*Id*., p. 266.) Johnston testified

that he thought Petitioner was telling the truth, and so he "kind of went along with

everything that he said in the 24-hour period." (*Id*.)

The pair stopped at a bar, but the bartender wouldn't serve them because they

didn't show their identification. Another bar patron told them that the Riverside Bar in

Burley might still be open. They traveled around Burley to try to find the bar, without

success.

They stopped and parked at a Mexican restaurant, and then walked over to

Hollywood video. They purchased some items in the video store. At trial the video store

clerk was able to identify Petitioner by his clothing.  (*Id*., pp.416-22.) When they left the

store, they saw that police officers had barricaded the bridge leading to Johnston's car.

Because they could not get back to the car, they then jumped the fence at the Deseret

Industries, went around the back, and sat inside a semi-box full of old furniture for about

an hour. (*Id*., pp. 267-73.)

Johnston testified that, after the police removed the barricade and left, he and Petitioner walked across the street to the Payless Car Sales lot. Johnston urinated behind the office. (*Id.*, pp. 273, 323.) Petitioner kicked in the door of the car lot office, found a box of keys, started rummaging through it, and began pushing remote buttons. Petitioner found keys to two Chevy Duramax quad-cab pickup trucks—maroon and red. Petitioner drove away in the maroon truck, and Johnston drove away in the red truck. (*Id.* p. 273.)

They drove the trucks to Johnston's Mustang, where Johnston put his computer, printer, camera, and other items into the red truck. They next stopped at Walmart, where they purchased two clear license plate covers and a power inverter power cord to plug Johnston's printer into the truck. The pair was captured on video at Walmart—Petitioner in his distinctive hat. (*Id.*, p. 211.)

Johnston took a photograph of an 18-wheeler's "California Trailer" license plate. He altered it on his computer, removing the "Trailer" word. He printed it out on his computer twice, fit the copies into the license plate holders, and attached them to the trucks. The two stopped at a gas station and pumped gas into the trucks, and then Petitioner directed them back to the Payless car lot. While at the gas station, Johnston hit a concrete barrier and damaged the red truck. (*Id.*, pp. 278-81.)

Johnston testified that Petitioner rummaged through the Payless office desks and found a log book. Petitioner told Johnston that the log book showed Johnston's father had been bringing in deliveries of trailers and cars, that the log was filled with his father's

handwriting, and that his father had helped arrange this as part of the witness protection program. Johnston says that they discussed returning to Utah to pick up Johnston's ex-girlfriend and her mother and bring them to Idaho. Petitioner told Johnston they [Petitioner and Johnston and/or the ex-girlfriend and her mother] were going to be managing the car lot and living in the trailer homes behind the car lot, where there was a unit prepared for them. (*Id*., pp. 290-91.)

Petitioner next gave Johnston the keys to a silver Chevrolet SUV, and said they needed to take another car to Utah. Petitioner told Johnston to find a flatbed trailer that could carry the SUV. Meanwhile, Petitioner was trying to load another vehicle onto a cargo trailer. Both were unsuccessful at loading the vehicles onto the trailers. (*Id*., pp. 291-94.)

At that point, Johnston called his father to try to get some advice about what he was supposed to be doing at the car lot. Johnston describes his father as "dumbfounded." His father did not know what Johnston was talking about. Johnston's father told him to stay at the car lot, and he would drive to Idaho to try to help him figure things out. Petitioner was uneasy when he learned Johnston's father was coming and told Johnston that they just needed to get going with what they had. Johnston told Petitioner he wanted to wait for his father to come up and tell him what was going on. Petitioner got into the maroon truck with the attached cargo trailer and drove away in the direction of the interstate highway. (*Id*., pp. 294-95.)

Johnston stayed, called the police, and talked to the owner of Payless. Johnston eventually entered into a plea agreement with the State in exchange for his trial testimony against Petitioner. (*Id.*, pp. 297-99.)

Petitioner was questioned by a police investigator on October 13, 2004. He said that he was purchasing a vehicle in Ogden, Utah, and he needed to secure another truck so that he could take parts from that truck and fix the other truck he wanted to buy. He also said he went to Burley, Idaho to test drive some vehicles on October 3 or 4, 2004.

Petitioner admitted being in the Hollywood video store, but he said it was Johnston who walked across the street, broke into the Payless car lot office, stole the keys to a truck, and drove away, while Petitioner waited in the parked Mustang. Petitioner told the officer that he drove away in Johnston's Mustang. Petitioner stated that he left the Mustang at a store in Jerome and took a bus back to Salt Lake City, because he did not want to have anything else to do with Johnston. (*Id.*, pp. 386-93.)

*Someone*—however—drove the maroon truck and cargo trailer toward Utah, then abandoned the cargo trailer on the freeway near Malad, Idaho. Several weeks after the maroon truck was stolen, it was found undamaged, parked at an apartment complex in Ogden, Utah. (*Id.*, pp. 213-14.)

Based on the information provided by Johnston and the identification of Petitioner by the video store clerk and in the Walmart surveillance camera photo, Petitioner was charged with grand theft in a criminal complaint filed in the Fifth Judicial District Court

in Minidoka County, Idaho. In a three-day trial in 2007, Petitioner was convicted by jury of grand theft, a felony. In 2008, he was sentenced to fourteen years in prison, with the first seven years fixed. Thereafter, Petitioner pursued a direct appeal, a post-conviction relief action, and numerous other actions in state court. All his efforts to overturn his conviction and sentence were unsuccessful.

## PRELIMINARY MOTIONS

Petitioner filed a request for a copy of all the state court lodgings. (Dkt. 39.) His request crossed in the mail with Respondent's response to an earlier Order requiring Petitioner to clarify which parts of the state court record he was missing and Respondent to provide those missing parts of the record upon which Respondent relied for his Motion for Summary Dismissal. (Dkt. 37, 38.) Respondent has notified the Court that he mailed Petitioner a copy of all the lodgings upon which he relied for his Motion for Summary Dismissal. (Dkt. 38.) Petitioner has not made an adequate argument to show that he requires any further items to address the statute of limitations or related issues. Therefore, the Court will deem Petitioner's Motion Requesting Copy of Lodgings (Dkt. 39) moot.

Petitioner has filed several motions for appointment of counsel. (Dkt. 40, 59.) There is no constitutional right to counsel in a habeas corpus action. *Coleman v. Thompson,* 501 U.S. 722, 755 (1991). A habeas petitioner has a right to counsel, as provided by rule, if counsel is necessary for effective discovery or if an evidentiary hearing is required in his case. *See* Rules 6(a) & 8(c) of the Rules Governing Section

2254 Cases. In addition, the Court may exercise its discretion to appoint counsel for an indigent petitioner in any case where required by the interests of justice. 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B). Whether counsel should be appointed turns on a petitioner's ability to articulate his claims considering the complexity of the legal issues and his likelihood of success on the merits. *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983).

Petitioner is a frequent litigator who also acts as a jailhouse lawyer for others. (*See* Dkt. A-3.) He has been able to adequately assert his interests in state and federal court as well as, or better than, any pro se inmate. The issues before the Court are not complex. Petitioner has access to his own mental health records during the time period in question, but has not made an effort to place those before the Court. In addition, the Court earlier notified Petitioner to prepare an affidavit or declaration explaining how he was able to file so many state court actions while the federal statute of limitations period was running, despite his allegations of debilitating mental limitations.

These simple tasks do not require the help of an attorney. For these reasons, and because there is no need for discovery or an evidentiary hearing, the requests for appointment of counsel will be denied.

Petitioner has filed two Motions for Discovery, a Motion for Production, a Motion to Expand the Record, and two Motions for a Hearing. (Dkts. 41, 42, 48, 50, 54, 55.)

Petitioner requests a variety of items to help him show that he is actually innocent of grand theft.

Petitioner earlier requested that Respondent be required to produce verifiable finger prints of Johnston, Petitioner's co-conspirator, who testified against him at trial. Petitioner also sought an NCIC criminal history report of Johnston. The Court determined:

> Petitioner does not provide any reason why this information is relevant to the statute of limitations, equitable tolling, or actual innocence issues at hand. Discovery on the merits of the claims generally is not permitted in a habeas corpus action, and, in any event, would be premature. Therefore, the Court will deny the request without prejudice to Petitioner making a showing that the items are relevant to the threshold procedural issues.

(Dkt. 37, p. 2.)

In his current motion, Petitioner again provides no explanation as to how the items he desires are going to demonstrate that he is factually innocent of grand theft, for example, a photo of the stolen truck, two copies of photos of the license plate, a photo of himself, and various items pertaining to his co-conspirator and witnesses. (Dkt. 41.)

Petitioner was identified by the Hollywood Video clerk and in the Walmart surveillance camera photo on the date of the incident. Petitioner clearly was accompanied by Johnston at that time. Whether Petitioner took the maroon truck and cargo trailer is

based solely on th testimony of Johnston, but there is enough corroborating circumstantial evidence to support Johnston's testimony.

Petitioner has suggested that their mutual acquaintance Derrick was the person who stole the maroon truck and cargo trailer. However, Petitioner himself admitted to a police investigator that he was with Johnston the night of the break-in of the Payless Car Sales office. Derrick was not seen at the video store before the trucks were stolen, nor was he seem in the photo taken after the trucks were stolen. *Petitioner*, however, was seen with Johnston both before and after the trucks were stolen.

Petitioner has come forward with no reasonable explanation why he would be with Johnston in Walmart *after* the trucks were stolen, standing by as Johnston selected and bought license plate holders and an inverter cord for his printer to print off new "license plates." The jury clearly believed the story of Johnston—that it was Petitioner who stole the maroon truck and cargo trailer. Whether it was Petitioner or Johnston who originally broke in to the dealership was *not* the basis for a separate criminal charge. The only issue for the jury was whether Petitioner stole the maroon truck and trailer at about the same time that Johnston stole the red truck.

The record makes it abundantly clear that Petitioner is not actually innocent. Petitioner has not revealed how any of the items he seeks will show his *factual* innocence. Therefore, the first Motion for Discovery will be denied.

In his second Motion for Discovery, Petitioner seeks to propound interrogatories, requests for admissions, and requests for production to seven individuals, including his co-conspirator. As with Petitioner's earlier request for discovery, many of his requests are not relevant to the statute of limitations issue at hand. Those items that are somewhat relevant—such as the condition of his mental health before and during trial—are already contained in the state court record before the Court.

One of the particular questions at issue is Petitioner's competence during the federal statute of limitations period—2011 to 2013—rather than his state of competency in 2004 to 2008. Petitioner had the time and ability to obtain his prison mental health records between 2011 and 2013, but did not submit them. This request will be denied.

, Petitioner's Motion for Production (Dkt. 42) requests additional portions of the record. The Court rejects Petitioner's argument that he needs additional state court records to show his actual innocence, because he has not stated how the items will aid in his showing. His reasoning included in the Motion is not focused on actual innocence, but legal innocence:

> Petitioner advise[s] the Court that on March 31, 2008, a copy of the forged document which indicated that Mr. Joshua E. Johnston [co-conspirator] was born in Mississippi where he utilized the SSN [XXX-XX]-7435 and his real changes [were] filed during the sentencing hearing. These documents need to be produced to show the level of corruption and both judicial and prosecutorial misconduct.

(Dkt. 42, p. 4.) No additional portions of the record will be produced to Petitioner.

**MEMORANDUM DECISION AND ORDER - 11**

Petitioner has also filed a Motion to Expand the Record. (Dkt. 55.) Petitioner alleges that the records will be used "to obtain evidence to show that the Petitioner is innocent of the alleged grand theft … of which Petitioner was illegally convicted on November 6, 2007. As noted above, the objects of his request suggest that he is attacking legal, not factual, innocence, for example, "the Lodgings for June 13, 2005, including waiver of speedy trial"; "the lodgings for April 10, 2007, including hearing audio recordings for CR2004-2628 on motions in limine"; "the lodgings for April 11, 2007, including order for psychiatric or psychological examination and order for payment of examination." (Dkt. 55, p. 3.)[1] In addition, many of the items he requests already are contained within the record before the Court, and Respondent has provided those lodgings to Petitioner. Further, Petitioner has some state court records in his possession, but he has refused to provide a list of those to the Court despite an order to do so, instead asking for the entire lodging in this action. Therefore, this late request will be denied.

Finally, because there is no need for a hearing in this matter, the requests for hearings will be denied. (Dkt. 48, 50.) Petitioner's attempts to show that he currently is delusional—despite his continuous filings that demonstrate his ability to protect his

---

[1] The Court likewise rejects Petitioner's attempt to show that he believes he is still enlisted in the United States military and therefore (according to him) he should be appointed the United States Attorney General to represent him in this matter. (*See* Dkt. 59.) Petitioner has many times reported that he was honorably discharged from the military when he was injured in basic training. (*See* Dkt. A-3.) Under no set of circumstances does Petitioner qualify for appointment of counsel in this case.

interests—are unavailing. (*See* Dkt. 48, stating that he is a federal agent who has been kidnapped by state actors, thwarting his investigation of terrorism in the court system in the continental United States;[2] Dkt. 50 (same); see also references to November 8, 2007 Mental Health Evaluation by Mike Waite, LCSW, in State's Lodging A-3, Presentence Investigation Report: "Due to his personality disorder … there is a risk of him acting out if he does not receive mental health treatment. However, this will be due to his manipulation of the system rather than being caused by an untreated mental illness. If he does not get the mental health treatment he wants, he may act out just to prove a point.")

## ONE-YEAR STATUTE OF LIMITATIONS ISSUE

Based upon the parties' earlier briefing of the statute of limitations issue, the Court preliminarily concluded that the original Petition in this matter was filed beyond the one-year mark. The Court notified the parties that it would entertain supplemental briefing from both parties to address whether equitable tolling is warranted or grounds exist for a showing of actual innocence, and to address whether Petitioner's latest round of state court filings had any impact on the statute of limitations issue. The Court has now reviewed the entirety of the record before it.

---

[2] It is no coincidence that this story about himself is similar to the story Petitioner told Johnston about Johnston's father to entice Johnston to help steal the trucks.

## 1. Standards of Law

### A. *Habeas Corpus Review*

When a petitioner's compliance with threshold procedural requirements is at issue, a respondent may file a motion for summary dismissal, rather than an answer. *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989). Rule 4 of the Rules Governing § 2254 Cases authorizes the Court to summarily dismiss a petition for writ of habeas corpus when "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." The Court takes judicial notice of the records from Petitioner's state court proceedings lodged by the parties.

### B. *Statute of Limitations*

The Antiterrorism and Effective Death Penalty Act (AEDPA) requires a petitioner to seek federal habeas corpus relief within one year from several triggering dates specified in 28 U.S.C. § 2244(d)(1)(A)-(D). Which trigger is applicable depends on the nature and timing of the petitioner's claims. The first trigger, § 2244(d)(1) provides a means of calculating the limitations start date for the "application" as a whole, § 2244(d)(1)(A) (date of final judgment). The remaining three triggers require claim-by-claim consideration, § 2244(d)(1)(B) (governmental interference); § 2244(d)(1)(C) (new right made retroactive); § 2244(d)(1)(D) (new factual predicate). *See Mardesich v. Cate*, 668 F.3d 1164 (9th Cir. 2012), relying in part on dicta in *Pace v. DiGuglielmo*, 544 U.S. 408, 416 n.6 (2005)).

In all instances, *one year* means 366 days, for example*, from January 1, 2000, to January 1, 2001. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (applying Federal Rule of Civil Procedure 6(a) to AEDPA).

The most common trigger is the first one, "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."[3] 28 U.S.C. § 2244(d)(1)(A). That date can be calculated as follows.

| Action Taken | Finality Occurs |
|---|---|
| No appeal is filed after state district court order or judgment | 42 days later, *see* Idaho Appellate Rule 14 |
| Appeal is filed and Idaho Court of Appeals issues a decision, but no petition for review is filed with the Idaho Supreme Court | 21 days later, *see* Idaho Appellate Rule 118 |
| Appeal is filed and Idaho Supreme Court issues a decision or denies a petition for review of an Idaho Court of Appeals decision, and Petitioner does not file a petition for writ of certiorari with the United States Supreme Court | 90 days later, *see* United States Supreme Court Rule 13 |
| After Idaho Supreme Court issues a decision or denies a petition for review, Petitioner files a petition for writ of certiorari to the United States Supreme Court, and the petition is denied | Date of denial |
| After Idaho Supreme Court issues a decision or denies a petition for review, Petitioner files a petition for writ of certiorari to the United States Supreme Court, the petition is | Date of decision |

---

[3]     Several other triggering events for the statute of limitations exist—but are less common—and are set forth in subsections 2244(d)(1)(B)-(D).

| granted, and the United States Supreme Court issues a decision | |
|---|---|

In each instance above, "finality" is measured from entry of the final judgment or order, not from a remittitur or mandate, which are mere formalities. *Gonzales v. Thaler*, 132 S.Ct. 641, 653 (2012); *Clay v. United States*, 537 U.S. 522, 529 (2003); *Wixom v. Washington*, 264 F.3d 894, 898 n.4 (9th Cir. 2001).

AEDPA also contains a tolling provision that stops or suspends the one-year limitations period from running during the time in "which a properly filed application for State postconviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d)(2). The "time limits on postconviction petitions are 'condition[s] to filing,' such that an untimely petition [is] not deemed 'properly filed.'" *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005) (quoting *Artuz v. Bennett*, 533 U.S. 4, 8, 11 (2000)).

Because this statutory tolling provision applies only to "pending" actions, the additional 21-, 42- and 90-day time periods associated with the calculation of finality after direct appeal are *not* applied to extend the tolling periods for post-conviction actions. However, unlike direct appeal "finality," the term "pending" *does* extend through the date of the remittitur.[4]

_____

[4]     *See Lawrence v. Florida*, 549 U.S. 327, 337 (2007). "Pending" is determined according to each particular state's law. In Idaho, an appellate case remains pending until a remittitur is issued. *See Cochran v. State*, 133 Idaho 205, 206, 984 P.2d 128, 129 (Idaho Ct. App. 1999).

The federal statute is *not* tolled between the date the direct appeal is "final" and the filing of a proper post-conviction application, or between post-conviction finality and any successive collateral review petition. *Id*. Each time statutory tolling ends, the statute of limitations does not restart at one year, but begins running at the place where it stopped before the post-conviction action was filed.

Once a federal statute of limitations has expired, it cannot be reinstated or resurrected by a later-filed state court action. *See Ferguson v. Palmateer*, 321 F.3d 820, 822 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed").

**2. Discussion of Statute of Limitations Issue**

On March 31, 2008, Petitioner's judgment of conviction and sentence was entered. On June 16, 2009, Petitioner's direct appeal concluded in the Idaho Supreme Court. On September 14, 2009, the judgment became final—90 days after June 16, 2009. (State's Lodging B-7.)

During the pendency of the direct appeal, on October 31, 2008, Petitioner filed his first state post-conviction petition. (State's Lodging C-1.) The post-conviction petition was still pending when the direct appeal concluded, and so the post-conviction action began tolling Petitioner's federal statute of limitations at that time.[5]

---

[5]     Between the date the jury found Petitioner guilty of the crimes at issue, November 6, 2007, and the conclusion of the first post-conviction action, Petitioner filed five motions for new trial. These are all

The first post-conviction action was unsuccessful. When the appeal of the post-conviction action was concluded in the Idaho Supreme Court by denial of the motion for reconsideration and issuance of the remittitur on January 27, 2012, tolling ended. (State's Lodging D-11.) Therefore, the 366-day federal statute of limitations began the next day, and was set to end on January 28, 2013, absent any further tolling.

A total of 284 days of the federal statute of limitations passed between January 28, 2012, and November 7, 2012, the day before Petitioner filed a "Motion for Correction of an Illegal Sentence." (State's Lodging K-1.) The Court will assume for purposes of this discussion that the motion tolled the federal statute, because, generally, a motion to reduce a sentence that is not a part of the direct review process and that requires re-examination of the sentence qualifies as a collateral review application that tolls the one-year statute of limitations. *Wall v. Kholi*, 562 U.S. 545, 555-56 (2011).

Petitioner's illegal sentence motion was denied. The denial was affirmed on appeal and the remittitur issued on May 29, 2013. (State's Lodgings K-1, K-8.) The appellate opinion specified that the appeal was dismissed "for the reason the illegality of the sentence did not appear from the fact [sic] of the record." (State's Lodging K-6.) Respondent argues that this outcome meant that the motion was not properly filed and should not toll the statute, but the question is a close call regarding whether the motion

---

irrelevant to the statute of limitations calculation because they began and ended during the pendency of the first post-conviction matter.

was denied on the merits or it did not meet the pleading standard of alleging how the sentence was illegal. For purposes of tolling, the Court will consider the motion properly filed.

On February 20, 2013, during the pendency of the illegal sentence motion, Petitioner filed a second successive post-conviction petition. On March 18, 2013, that petition was dismissed for lack of merit. On July 16, 2013, Petitioner's appeal was determined to be untimely and dismissed without adjudication of the merits, and the remittitur was issued. (State's Lodgings N-1, N-2, N-3, and O-3.) Even giving Petitioner the benefit of the doubt and extending tolling through July 16, 2013, the Court concludes that only 82 days remained of the federal statute of limitations period (366 – 284 = 82.) Under this generous calculation, Petitioner's statute of limitations expired 82 days from July 16, 2013, which was on Friday, October 6, 2013. Petitioner did not file his federal habeas petition until August 28, 2014, almost one year too late.

Petitioner also filed other state court motions during the foregoing period. As the Court will now explain, *neither* Petitioner's filings that were deemed improperly filed by the state court *within* the federal statute of limitations period, *nor* those that were filed *after* the federal statute of limitations expired served to extend, toll, or resurrect the one-year period.

First, untimely collateral actions are considered "improperly filed" for federal statute of limitations purposes. *See* 28 U.S.C. § 2244(d)(2); *Pace*, 544 U.S. at 417. Petitioner's actions falling into this category include the following:

- On February 18, 2011, during the pendency of the first post-conviction action, Petitioner filed a successive post-conviction action in state court, which was dismissed as untimely and frivolous. On appeal, dismissal of the petition was affirmed on untimeliness grounds. The appeal concluded in the Idaho Supreme Court on June 20, 2013. (State Lodgings G-1, H-5, and H-8.)

- On January 19, 2012, during the pendency of the first post-conviction action, Petitioner filed a sixth motion for a new trial, which was denied as untimely. The Idaho Court of Appeals affirmed denial of the motion on untimeliness grounds, and the action concluded in the Idaho Supreme Court on May 16, 2013. (State's Lodgings I-1, J-4, J-7.)

- On March 6, 2013, during the pendency of the illegal sentence motion, Petitioner filed a seventh motion for a new trial, which was dismissed as untimely and frivolous. The appeal concluded in the Idaho Supreme Court on June 20, 2014. (State's Lodgings L-1, M-6, M-12.)

Second, no state court action Petitioner filed after October 6, 2013, is relevant to the statute of limitations issue, because a federal statute of limitations cannot be re-started on the basis of a state action filed after the federal statute has expired.

Third, Petitioner's prior federal petition for writ of habeas corpus, in Case No. 1:09-cv-00251-CWD, *Smith v. Valdez*, filed during the course of his first state post-conviction proceeding, was dismissed without prejudice and did not toll the federal statute for purposes of his current action—both because it was dismissed before the first state post-conviction action was completed and because only *state court* actions toll the

federal statute. *See Duncan v. Walker*, 433 U.S. 167 (2001). Finally, the prior matter

cannot be re-opened to accommodate Petitioner's late filing here.[6]

---

[6] When the first petition was dismissed without prejudice in 2010, the law did not permit a fully-unexhausted petition to be stayed. *See Rhines v. Weber*, 544 U.S. 269 (2005); *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006). Since that date, the law has changed, *see Mena v. Long*, 813 F.3d 907, 912 (9th Cir. 2016). However, even such a change does not warrant the reopening of the judgment in the prior case, as the United States Supreme Court explained in *Gonzalez v. Crosby*, 545 U.S. 524 (2005):

> Petitioner's only ground for reopening the judgment denying his first federal habeas petition is that our decision in *Artuz* showed the error of the District Court's statute-of-limitations ruling. We assume for present purposes that the District Court's ruling was incorrect. As we noted above, however, relief under Rule 60(b)(6)—the only subsection petitioner invokes—requires a showing of "extraordinary circumstances." Petitioner contends that *Artuz*'s change in the interpretation of the AEDPA statute of limitations meets this description. We do not agree. The District Court's interpretation was by all appearances correct under the Eleventh Circuit's then-prevailing interpretation of 28 U.S.C. § 2244(d)(2). It is hardly extraordinary that subsequently, after petitioner's case was no longer pending, this Court arrived at a different interpretation. Although our constructions of federal statutes customarily apply to all cases then pending on direct review, *see, e.g., Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), not every interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final. If *Artuz* justified reopening long-ago dismissals based on a lower court's unduly parsimonious interpretation of § 2244(d)(2), then *Pace v. DiGuglielmo*, 544 U.S. 408, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005), would justify reopening long-ago grants of habeas relief based on a lower court's unduly generous interpretation of the same tolling provision.

*Id.* at 536–37.

A second petition does not "relate back" to an earlier petition, even if dismissed without prejudice. *Rasberry v. Garcia*, 448 F.3d 1150, 1155 (9th Cir. 2016). On that point, The United States Court of Appeals for the Fifth Circuit convincingly reasoned:

> "[I]f § 2244(d) were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to 'continue' his federal remedy, without running afoul of the statute of limitations." Construing an application filed after a previous application is dismissed without prejudice as a continuation of the first application for all purposes would eviscerate the AEDPA limitations period and thwart one of AEDPA's principal purposes.

**3.** **Equitable Tolling Exception**

**A.** *Standard of Law*

If a petition is deemed untimely, a federal court can hear the claims if the petitioner can establish that "equitable tolling" should be applied. In *Pace v. DiGuglielmo*, the Supreme Court clarified that, "[g]enerally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." 544 U.S. 408, 418 (2005). In addition, there must be a causal link between the lateness and the extraordinary circumstances. *See Bryant v. Arizona Attorney General*, 499 F.3d 1056, 1061 (9th Cir. 2007) (holding that a petitioner must show that his untimeliness was caused by an external impediment and not by his own lack of diligence). The petitioner bears the burden of bringing forward facts to establish a basis for equitable tolling. *United States v. Marolf*, 173 F.3d 1213, 1318, n. 3 (9th Cir. 1999).

Ignorance of the law without more, is not grounds for equitable tolling. *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) A petitioner's "inability correctly to calculate the limitations period" and "lack of legal sophistication" are not "extraordinary circumstance[s] warranting equitable tolling." *Id*.

––––––––––––––––––––––

*Graham v. Johnson*, 168 F.3d 762, 780 (5th Cir. 1999).

## B. *Discussion*

The record reflects that, in his past, Petitioner has experienced mental health issues that sometimes interfered with his rational thought processes. However, the record shows that, when Petitioner returned to a regimen of taking his prescribed medications regularly in late 2007, he was deemed restored to competence to stand trial.[7] This information is historically relevant, but the primary question here is whether Petitioner has shown that a status of incompetence existed in 2012 to 2013, during the federal statute of limitations period.

The record is inconsistent with Petitioner's assertion that he was mentally ill or incompetent to such a degree that he was unable to file a federal petition in time. Petitioner filed a continuous stream of pro se pleadings and papers in state court, *demonstrating* that he had the wherewithal to file a petition during the time period the federal statute of limitations was running. These observations are based on the following time chart, with dates and events gleaned from the state court record:

| | |
|---|---|
| October 8, 2004 | An Information was filed charging Petitioner with grand theft. (State's Lodging A-1.) |
| February 14, 2005 | After performing a psychological evaluation for purposes of helping the state court determine whether Petitioner was competent to stand trial, Ricky D. Hawks, Ed.D, concluded: Mr. Smith *did appear* to be suffering *from a moderate to severe mental disorder* but *no mental defect*. |

---

[7]     Petitioner disagrees with this conclusion of the state district court, but has never brought forward sufficient factual information to successfully challenge that conclusion.

**MEMORANDUM DECISION AND ORDER - 23**

- Mr. Smith was judged to have *an ability* to have a rational and factual understanding of the proceedings against him and of the punishment specified for the offenses charged.

However, as a result of his *mental disorder*,

- Mr. Smith was judged to have an *inability* to adequately consult with his counsel or to participate in the proceedings against him with a reasonable degree of rational understanding.

However, the *ultimate* decision of whether or not Mr. Smith is *legally "competent"* is left to the respective trier-of-fact.

(State's Lodging A-3.)

| | |
|---|---|
| June 24, 2005 | Petitioner was arraigned on the grand theft charges and released on bail. (State's Lodging A-1.) |
| April 10, 2007 | Petitioner's counsel recommended to the Court that Petitioner undergo a psychological evaluation to determine his fitness to participate in his defense and proceed to trial. Petitioner stated that before arrest he had been taking Haldol, Trazodone and Vistaril under the care of a VA doctor, but he had not been taking it for about a month. (State's Lodging A-4, pp. 24-27.) The Court continued the trial to permit Petitioner to be evaluated by Dr. Richard Smith. (*Id.*, pp. 52-54.) |
| May 2, 2007 | A psychological evaluation for competency was performed by Richard V. Smith, Ph.D, who concluded: |

In my opinion this examinee does not need to be re-hospitalized. He can in all likelihood be treated safely on an

outpatient basis and should resume
medications to stabilize his mood. That
being the case, once those medications
would become effective then he could in
all likelihood proceed with the matters in
court that he is currently facing.

(*Id.*)

June 4, 2007      The state court held a status hearing and Petitioner's counsel
provided this information:

Your Honor, the defendant had been
found not to be competent in aiding in
his own defense to a certain degree. We
have faxed copies of the report to the
Veterans Administration, where he is
being treated in Salt Lake. We have had
some trouble getting anything back from
them.

He is on his medication that they have
prescribed. We just have to have them
verify that that prescription is consistent
with the finding of Dr. Smith in the
report, so we're still trying to get the
verification. He indicates that he is
having his employer basically verify that
he is taking his prescriptions as required;
so once we get the documentation, we'll
provide that to counsel and to the court.

(State's Lodging A-4.)

October 29, 2007      Petitioner's counsel indicated that they were ready to go to
trial on October 31, 2007, so long as the jail was providing
Petitioner with his Trazodone. (The jail had temporarily
discontinued the medication because the bottle said it was
"for sleep.") (State's Lodging A-4.)

| | |
|---|---|
| October 31, 2007 | Petitioner's jury trial begins. (State's Lodging A-5.) |
| November 6, 2007 | Jury trial ends, having been held on three non-consecutive days. Petitioner is found guilty of grand theft. (*Id.*) |
| November 8, 2007 | Petitioner was evaluated by Mike Waite, LCSW, Adult Mental Health Care, in Rupert, Idaho, while Petitioner was in custody awaiting sentencing. Mr. Waite's clinical formulation and recommendations were as follows: |

> The client claimed he has been diagnosed bipolar in the past, but I did not see the symptoms currently or from his past history that would indicate such a diagnosis is accurate. I talked to him at length about his time in the military, in college, and in his jobs, and he did not once mention symptoms of bipolar disorder that got in the way of any of those pursuits. It is clear that he does not think his attorney is doing much to help him. He is angry he is still in jail. The longer he stays there, the angrier and the more anxious he gets.

(State's Lodging A-3.)

| | |
|---|---|
| March 31, 2008 | Petitioner was sentenced and entered Idaho Department of Correction custody. (State's Lodging A-5.) |
| October 31, 2008 | Petitioner filed a 30-page pro se petition for post-conviction relief and a motion for discovery. (State's Lodging C-1.) |
| December 11, 2008 | Petitioner filed a pro se motion for counsel, a supplemental motion for post-conviction relief, a motion to suppress evidence, and a request for discovery. Thereafter, he was represented by counsel. (*Id.*) |
| July 30, 2010 | Petitioner filed a 41-page pro se motion for new trial, a motion for disclosure of medical records, a motion to |

transport defendant, and a motion to represent himself with the assistance of [stand by] counsel. (State's Lodging E-1.)

| | |
|---|---|
| September 3, 2010 | Petitioner filed a pro se motion for a *Faretta* hearing. (*Id*.) |
| September 14, 2010 | Petitioner filed a pro se motion to alter or amend judgment and a notice of appeal. (State's Lodgings D-1, E-1.) |
| October 15, 2010 | Petitioner filed a pro se notice of appeal and a motion for appointment of state appellate public defender. (State's Lodging E-1.) |
| October 25, 2010 | Petitioner filed a pro se notice of appeal. (State's Lodging D-1.) |
| **January 28, 2012** | **Petitioner's federal habeas corpus statute of limitations began running.** |
| January 19, 2012 | Petitioner filed his sixth pro se motion for a new trial. (See State's Lodging M-11. |
| November 8, 2012 | Petitioner filed a motion for correction of illegal sentence. (State's Lodging K-1.) |
| November 28, 2012 | Petitioner filed a pro se notice of appeal. (State's Lodging K-1.) |
| March 11, 2013 | Petitioner filed his seventh pro se motion for new trial a motion for hearing, motion for appointment of counsel, and a motion to request court take judicial notice. (State's Lodgings L-1, M-1.) |
| April 23, 2013 | Petitioner filed a pro se notice of appeal and motion for appointment of counsel. (*Id*.) |
| May 1, 2013 | Petitioner filed a pro se notice of appeal. (State's Lodging N-5.) |
| May 16, 2013 | Petitioner filed a pro se response to the court's conditional dismissal and a memorandum in support. (State's Lodging |

O-2.)

| | |
|---|---|
| **October 6, 2013** | **Petitioner's federal habeas corpus statute of limitations expired.** |
| May 15, 2014 | Petitioner filed a pro se successive post-conviction petition (State's Lodging P-1.) |

The record demonstrates that Petitioner pursued a steady course of action of challenging his conviction and sentence in several overlapping and successive state court actions. He filed at least ten pleadings and papers in state court while the federal statute of limitations was running. Petitioner's state court filings demonstrate that he was able to protect his interests by filing supporting motions and memoranda, requesting counsel (distinguishing between full representation and limited-purpose representation), and pursuing appeals, including filing petitions for reviews with briefing.

As with many inmates, it is most likely that Petitioner mistakenly believed that the federal one-year statute of limitations would not begin until one full year after completion of his *last* state post-conviction matter. He likely did not know that continuing to pursue additional state court actions that are later found to be procedurally improper by the state courts is a strategic gamble that often lands a petitioner in the unfortunate place of having that action retroactively deemed a non-tolling event for the federal habeas statute of limitations. While unfortunate, these mistakes are classified as instances of ignorance of the law, which is not a legally acceptable excuse for missing the statute of limitations. The record does not reflect any mental health issues that would have prevented Petitioner

from filing his federal petition within the proper time frame, instead of continuing to pursue state court actions.

The Idaho Court of Appeals has addressed Petitioner's claims of mental illness as the basis for tolling state deadlines several times, concluding that his pro se post-conviction filings "demonstrated his ability and mental acuity to understand his claims and raise them." *State of Idaho v. Smith*, Case No. 40947, Op. 353 (Idaho Ct. App. Feb. 7, 2014) (unpublished). It appears that, rather than file his new federal habeas matter within the one-year period, Petitioner made a choice to repeatedly file many different state petitions attempting to gain relief—many of which extended well beyond state and federal filing deadlines.

In *Whalem/Hunt v. Early*, 233 F.3d 1146 (9th Cir. 2000) (*en banc*), the Ninth Circuit Court held that the inadequacy of a prison library—particularly, the unavailability of a copy of AEDPA—could constitute an impediment to filing under § 2244(d)(1)(B). The Court ordered Petitioner to bring forward any facts supporting such a claim for equitable tolling in his supplemental briefing, but Petitioner has chosen not to file a supplemental brief after two lengthy extensions of time.

**4. Actual Innocence Exception**

**A. *Standard of Law***

The United States Supreme Court has determined that there is an "actual innocence" exception to the AEDPA statute of limitations, and that the exception applies

where a petitioner meets the rigorous actual innocence standard of *Schlup v. Delo*, 513

U.S. 298 (1995). *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013). "'Actual innocence

means factual innocence, and not mere legal insufficiency.'" *Marrero v. Ives*, 682 F.3d

1190 (9th Cir. 2012) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

To make a showing of actual innocence under *Schlup*, a petitioner must present

new evidence showing that "'it is more likely than not that no reasonable juror would

have convicted [the petitioner].'" *Perkins*, 133 S.Ct. at 1933 (quoting *Schlup*, 513 U.S. at

329). This exception is to be applied only in the "extraordinary" or "extremely rare" case.

*House v. Bell*, 547 U.S. 518, 538 (2006); *Schlup*, 513 U.S. at 320-21.

In *Larsen v. Soto*, the United States Court of Appeals for the Ninth Circuit

summarized the difference between those cases that meet the high actual innocence

standard, and those that do not:

> The *Schlup* standard "is demanding," *Perkins*, 133 S.Ct. at 1936, and
> precedents holding that a habeas petitioner satisfied its strictures have
> typically involved dramatic new evidence of innocence. In *House*, for
> instance, DNA evidence established that semen found on a murder victim
> came from the victim's husband and not from House, *see* 547 U.S. at 540–
> 41, 126 S.Ct. 2064, and there was evidence that the husband had a history
> of violence toward his wife, raising an inference that he "could have been
> the murderer," *id.* at 548, 126 S.Ct. 2064. In *Carriger*, the prosecution's
> chief trial witness had confessed in open court that he himself (and not
> Carriger) had committed the murder for which Carriger had been convicted.
> *See* 132 F.3d at 471–72. In contrast, we have denied access to the *Schlup*
> gateway where a petitioner's evidence of innocence was merely cumulative
> or speculative or was insufficient to overcome otherwise convincing proof
> of guilt. *See, e.g., Lee v. Lampert*, 653 F.3d 929, 943–46 (9th Cir. 2011);
> *Sistrunk v. Armenakis*, 292 F.3d 669, 675–77 (9th Cir. 2002). Thus, to
> satisfy *Schlup*, the petitioner's new evidence must convincingly undermine

the State's case. However, definitive, affirmative proof of innocence is not strictly required. As we explained in *Carriger*, a *Schlup* claim "is procedural, not substantive": a petitioner's new evidence must be sufficient to undermine a court's confidence in his conviction, but not to erase any possibility of guilt. 132 F.3d at 478.

742 F.3d 1083, 1095-96 (9th Cir. 2013).

"Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggin*, 133 S.Ct. at 1935. In other words, a petitioner's diligence should not be considered "discretely, but as part of the assessment whether actual innocence has been convincingly shown." *Id.*

## B. *Discussion*

Petitioner was ordered to bring forward an argument and evidence in support of actual innocence, if he had any. Petitioner has not made any plausible argument that he is innocent, as discussed in depth above. He attempts to procure evidence in discovery proceedings that does not appear to aid in the showing of *factual* innocence. The record supports the jury's verdict that Petitioner stole the maroon truck and cargo trailer, regardless of what Johnston did. The jury believed the testimony of Johnston, which was supported by circumstantial evidence. Petitioner has not met the high threshold for a showing of actual innocence.

## 5. Summary of Timeliness Issue

Having revisited the statute of limitations issue anew, including Respondent's earlier-filed Motion for Summary Dismissal, Petitioner's response, and the entire record,

the Court concludes that Petitioner's Petition for Writ of Habeas Corpus was untimely filed. Nothing in the record indicates that equitable tolling or the actual innocence exception applies. Therefore, the entire petition will be dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motions requesting Copy of Lodging (Dkt. 39) is DENIED as MOOT.

2. Petitioner's Motions for Appointment of Counsel (Dkts. 40, 59) are DENIED.

3. Petitioner's Motions for Discovery (Dkt. 41, 54) are DENIED.

4. Petitioner's Motion for Production (Dkt. 42) is DENIED.

5. Petitioner's Motions for Hearing (Dkt. 48, 50) are DENIED.

6. Petitioner's Motion to Expand the Record (Dkt. 55) is DENIED.

7. The Petition for Writ of Habeas Corpus is DISMISSED with prejudice.

8. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. See 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.

9. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward

   a copy of the notice of appeal, together with this Order, to the United States

   Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of

   appealability from the Ninth Circuit by filing a request in that court.

DATED: September 24, 2018

B. Lynn Winmill
Chief U.S. District Court Judge